IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEANNICE LORRAINE FURGERSON,            No. 6:15-cv-02136-HZ

        Plaintiff,

    v.

CAROLYN W. COLVIN, Acting                OPINION & ORDER
Commissioner of Social Security,

        Defendant.

Katherine L. Eitenmiller
Robert A. Baron
HARDER, WELLS, BARON & MANNING, P.C.
474 Willamette, Suite 200
Eugene, Oregon 97401

    Attorneys for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Janice E. Herbert
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

1 - OPINION & ORDER

Michael S. Howard
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S/ 221A
Seattle, Washington 98104-7075

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Jeannice Furgerson brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I affirm the Commissioner's decision.

## PROCEDURAL BACKGROUND

      Plaintiff applied for DIB and SSI on August 17, 2011, alleging an onset date of June 1, 2000.[1] Tr. 248-56 (DIB); Tr. 257-63 (SSI); see also Tr. 18 (referring to protective filing date of August 17, 2011). Her applications were denied initially and on reconsideration. Tr. 107, 109-23, 169-73 (DIB Initial); Tr. 108, 124-38, 174-78 (SSI Initial); Tr. 139-52, 167, 181-84 (DIB Reconsideration); Tr. 153-66, 168, 185-86 (SSI Reconsideration).

      On June 5, 2014, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 48-106. On June 24, 2014, the ALJ found Plaintiff not disabled. Tr. 15-34. The Appeals Council denied review. Tr. 1-7.

## FACTUAL BACKGROUND

      Plaintiff alleges disability based on having a neurogenic bladder, bipolar disorder, post-

---

[1] At the hearing, Plaintiff amended her alleged onset date to June 1, 2003. Tr. 52.

traumatic stress disorder (PTSD), high cholesterol, depression, a "tendancy [sic] to over medicate," type II diabetes, Hepatitis C, and drug dependency.  Tr. 286.  At the time of the hearing, she was forty-seven years old.  Tr. 250 (showing date of birth).  She has a GED and has past relevant work experience as a sales attendant, survey worker, telephone customer service representative, and exotic dancer.  Tr. 26, 53.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  See Valentine v. Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).   The claimant bears the ultimate burden of proving disability.  Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner]

3 - OPINION & ORDER

acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  <u>Yuckert</u>, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, the claimant is not disabled.  If the claimant cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her amended alleged onset date.  Tr. 20.  Next, at step two, the ALJ determined that Plaintiff has severe impairments of neurogenic bladder; spondylosis of the lumbar spine; bilateral mild to moderate sensorineural hearing loss/early otosclerosis; conversion disorder; major depressive disorder; borderline personality disorder; bipolar disorder; anxiety; opiate and benzodiazepine dependence; somatization disorder; adjustment disorder with mixed anxiety and depressed mood; and panic disorder with agoraphobia.  Tr. 20-21.  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal, either singly or in combination, a listed impairment.  Tr. 21-23.

At step four, the ALJ concluded that Plaintiff has the RFC to perform a range of medium

work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except she is limited to no more than frequent climbing of ramps or stairs.  Tr. 23.  She can occasionally stoop and can frequently crouch or crawl.  Id.  She must avoid more than moderate exposure to workplace hazards, such as unprotected heights or hazardous or moving machinery.  Id.  She can understand and carry out no more than simple instructions in a work environment involving simple, work-related decisions, with few, if any, workplace changes.  Id.  She can tolerate no more than occasional, indirect contact with coworkers or the general public.  Id.

With this RFC, the ALJ determined that Plaintiff is unable to perform any of her past relevant work.  Tr. 26-27.  However, at step five, the ALJ determined that Plaintiff is able to perform jobs that exist in significant numbers in the economy such as laundry sorter, hand packager, and cleaner II.  Tr. 2-28.  Thus, the ALJ determined that Plaintiff is not disabled.  Tr. 27.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation marks omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  Vasquez, 572 F.3d at 591

(internal quotation marks and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

DISCUSSION

Plaintiff alleges that the ALJ erred by finding her not wholly credible, by improperly rejecting the opinion of examining psychologist Scott Alvord, Psy.D., and by improperly rejecting the testimony of her husband.  Based on these errors, Plaintiff contends that the ALJ erred at in steps four and five.

I.  Credibility

The ALJ is responsible for determining credibility.  Vasquez, 572 F.3d at 591.  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  Carmickle v. Comm'r, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); see also Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about

the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain. Id.; see also Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in Molina;

In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

7 - OPINION & ORDER

<u>Molina</u>, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged by Plaintiff. Tr. 24. But, the ALJ further found that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." <u>Id.</u> In support of this finding, the ALJ first indicated that Plaintiff's complaints of disabling pain were not supported by the medical evidence. <u>Id.</u> (citing Tr. 492-503 (noting May 2004 complaint of "excruciating" pain but medical imaging studies were "unremarkable" and emergency room staff observed "very minimal tenderness"; further noting normal electroencephalogram even during reported seizures)). Next, the ALJ found that Plaintiff's lack of candor with treatment providers regarding her substance abuse undermined her credibility. Tr. 25. The ALJ noted that in May 2004, Plaintiff told Dr. Corina Rachita, M.D., that she had not used alcohol since 1995 and had abstained from drug use for "a longer duration than that." <u>Id.</u> (citing Tr. 500). However, in July 2005, upon admission to a residential substance abuse treatment facility, she reported using methamphetamines on weekends until 2004. <u>Id.</u> (citing Tr. 512).

Third, the ALJ found that Plaintiff's "historically tenuous connection to the workforce prior to her originally alleged onset date in 2000[]" eroded her credibility. <u>Id.</u> The ALJ explained that Plaintiff's earning summary indicated that Plaintiff did not work at a substantial gainful activity level between 1983 and 1993 and she had no reported earnings whatsoever between 1989 and 1993. <u>Id.</u> (citing Tr. 272). The ALJ found that Plaintiff's work history suggested that her "chronic unemployment was not entirely attributable to her alleged health problems." <u>Id.</u>

Fourth, the ALJ found that Plaintiff's trip to Central America in 2007 and her participating in free diving and snorkeling was inconsistent with her reported health problems. Id.  The ALJ noted that although Plaintiff subsequently complained of vertigo symptoms and hearing loss as a result of those activities, the symptoms ultimately resolved without treatment and in early 2010, she denied any incidents of transient paralysis, weakness, seizures, syncope, or vertigo.  Id.

Fifth, the ALJ noted that in 2010, during treatment for a suprapubic tube to address urinary retention and severe bladder symptoms, Plaintiff presented as alert and cooperative, and with a normal mood, affect, attention span, and concentration.  Id. (citing Tr. 1405).  The ALJ found these observations to be inconsistent with a debilitating mental condition.  Id.

Sixth, the ALJ noted that Plaintiff did not file her disability benefits applications until September 2011.  Id.  The ALJ cited contemporaneous medical records indicating that Plaintiff was experiencing acute pain from a urinary infection, but that she was otherwise alert, oriented, in no apparent distress, with a normal mood and affect and with intact judgment and insight.  Id. (citing Tr. 2072).

Plaintiff argues that the ALJ disregarded the nature of Plaintiff's impairments and as a result, the reasons articulated by the ALJ are not clear and convincing reasons supported by substantial evidence in the record when the evidence is considered in context.  For example, Plaintiff does not dispute that she made inconsistent statements about her substance use.  Plaintiff notes, however, that she has been forthright in reporting her addiction, recovery, and relapse history to the Social Security Administration (SSA).  She argues that her failure to be forthright in reporting substance use to medical providers "documents the course of her addiction," but it

9 - OPINION & ORDER

does not undermine or contradict her disability allegations.

Defendant argues that inconsistent reports to medical providers undermine Plaintiff's reliability. The cases support Defendant's argument. As noted above, an ALJ may use "ordinary techniques of credibility evaluation" when assessing a claimant's credibility. Molina, 674 F.3d at 1112. A claimant's inconsistent statements may reasonably suggest that the claimant is not entirely candid when reporting history or symptoms. E.g., Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (ALJ did not err by considering the claimant's presentation of conflicting information about her drug and alcohol usage to medical providers to reject her allegations of pain; affirming the ALJ's inference that "this lack of candor" carried over to the claimant's description of physical pain); see also Del Cielo v. Astrue, 737 F. Supp. 1271, 1279-80 (E.D. Wash. 2010) (concluding that the ALJ was entitled to rely on inconsistent statements regarding the claimant's income despite the claimant's argument that the statements were related to his "bipolar symptomology"). Substance abuse may be consistent with Plaintiff's mental disorders. But, making inconsistent statements about the substance abuse to medical providers is not an inherent part of Plaintiff's addiction or mental illness.

Next, Plaintiff challenges the ALJ's finding regarding her poor work history. She contends that her longstanding mental disorders have caused a history of vocational struggles. She notes her long history of "significantly limiting psychiatric symptoms, instability, and resistance to treatment." Plf.'s Brief at 30. She cites to her testimony that she has always had "issues" with her symptoms becoming exacerbated in 2003. But, as Defendant notes, although she asserts that her bipolar disorder has been a lifelong condition, Plaintiff did not claim to be disabled in earlier years. It was not error for the ALJ to conclude that if Plaintiff's symptoms

before her amended alleged onset date of June 1, 2003 prevented her from working, she would have applied for or claimed disability at some previous point in time.  Her failure to do so allowed the ALJ to reasonably infer that she lacked the motivation to work which in turn supported the ALJ's finding that her present assertions of inability to work and the reasons therefore were not credible.  E.g., Thomas, 278 F.3d at 959 (affirming ALJ's negative credibility determination when the ALJ found that the claimant had an "extremely poor work history" and had "shown little propensity to work in her lifetime, which negatively affected her credibility regarding her inability to work.").

Next, Plaintiff faults the ALJ for finding her trip to Central America to be inconsistent with her disabling symptoms because, she argues, the record makes clear that this trip occurred during a manic episode.  Thus, she contends that the trip supports her disabling condition rather than contradicts it.  Plaintiff went to Central America in 2007.  In a May 2008 office visit note, Dr. Carl Schreiner stated that Plaintiff complained of hearing loss and vertigo with her symptoms starting "one year ago when she was down in Belize, Central America, free diving and snorkeling."  Tr. 1132.  He then wrote: "She does this quite frequently."  Id.[2]

In a 2014 psychological assessment, Plaintiff discussed her employment history with Dr. Alvord.  Tr. 2115-16.  She described her work as an exotic dancer.  Tr. 2115.  Then, according to Dr. Alvord, she

> began describing a significant grandiosity associated with her exotic dancing, as well as lavish trips she would take with her kids, evidently at times putting them in danger.  She perseverated on a situation in which "I took my kids to the South American jungle and I can remember sort of coming to my senses when we were

---

[2]  This statement by Dr. Schreiner reasonably suggests that the 2007 trip in which she went free diving and snorkeling was not the only one she took.

> all in the back of a truck in the middle of the jungle being driven by someone I
> didn't know."

Tr. 2115-16.  Dr. Alvord described this as a "clear example of a person in the midst of a manic

episode[.]" Tr. 2116.  Later, in the section containing his diagnostic impressions, Dr. Alvord

concluded that Plaintiff suffers from the chronic severe condition of Bipolar Affective Disorder.

Tr. 2120.  He wrote that Plaintiff had "endorsed symptoms further consistent with acute mania

including picking up and taking trips without regard for finances, the safety of her children, etc."

Id.  He again noted Plaintiff's prior description of finding herself in the jungles of Belize with her

children and suddenly wondering "why am I here and why am I doing this to my kids."  Id.

Dr. Alvord's assessment that Plaintiff's taking her children to the jungle of Belize was

evidence of a manic episode, is the only such assessment in the record.  It came seven years after

the 2007 trip in which Plaintiff snorkeled and went free diving.  The only near contemporaneous

record of the 2007 trip is the 2008 report to Dr. Schreiner of her vertigo and hearing loss.  There

appear to be no contemporaneous records showing that Plaintiff exhibited manic symptoms about

the time of the 2007 trip or showing that any other health care professional made that assessment

at or near that time.  While Dr. Alvord offers his opinion about the nature of the event, it was not

error for the ALJ to disregard it as an after-the-fact assessment of an incident with no

contemporaneous records in support.  With that, the ALJ did not err in concluding that Plaintiff's

ability to travel to Central America and go free diving and snorkeling was inconsistent with her

claims of disabling symptoms.

Plaintiff offers other arguments in support of her position that the ALJ's credibility

determination is flawed.  I do not address them because even if the ALJ erred as to some bases,

12 - OPINION & ORDER

which I only assume but do not actually find, the ALJ has offered at least three clear and convincing reasons supported by substantial evidence in the record, to support the credibility finding.  See Batson v. Comm'r, 359 F.3d 1190, 1197 (9th Cir. 2004) (error by ALJ as to one basis for adverse credibility determination is not fatal to determination if ALJ gave other reasons which are supported by substantial evidence in the record).

II.  Evaluations by Dr. Alvord and Dr. Cole

In 2014, Plaintiff underwent two psychological evaluations, one with Gregory A. Cole, Ph.D., and one with Dr. Alvord.  Dr. Cole's examination occurred in February 2014.  Tr. 1949-57.  Dr. Cole interviewed Plaintiff, assessed her behavior, administered the Wechsler Memory Scale-Immediate and Delayed Memory test, the Beck Depression Inventory II test, and had Plaintiff complete a variety of mental status tests.  Tr. 1949.  He also reviewed records, including reports by Serenity Lane.  Id.

In describing her mental status test findings, Dr. Cole noted that Plaintiff was able to indicate the date, time, and day, as well as the current President of the United States.  Tr. 1951.  She was dressed appropriately.  Id.  Her affect was congruent with her verbalizations.  Id.  She had good eye contact and a relaxed posture.  Id.  Her speech was intelligible although somewhat pressured.  Id. Her attitude was overall engaged and cooperative.  Id.  Her thought processing and thought content were generally organized.  Id.  She was noted to be a fair historian.  Id.  Her insight and judgment were fair as evidenced by her appropriate responses to several questions such as what she would do if she were in a crowded theater and smelled smoke and saw fire.  Id.

In regard to her emotional state, she described feeling down on-and-off for years.  Tr. 1952.  She noted wide mood swings with periods of increased energy where her thoughts race.

13 - OPINION & ORDER

Id.  She reported diminished concentration ability.  Id.  She expressed "[s]ome feelings of hopelessness, but no suicidal ideation."  Id.  She reported experiencing anxiety.  Id.  She stated that she has bad dreams and has physiological reactions when she thinks of tragic events in the past such as her brother dying from a car accident and a former husband and son committing suicide.  Id.  She was not paranoid.  Id.

She was able to complete a simple multi-step task with no errors when asked to sequentially place five items, one item after another, after instructions.  Id.  She recalled six digits forward and four digit backwards, with mild attention and concentration problems noted on the latter.  Id.  She exhibited average intellectual capabilities.  Id.  She was able to appropriately respond to simple proverbs.  Id.  She successfully completed a "serial seven's" task with no problems with attention and concentration.  Id.  She was able to mentally manipulate arithmetical calculations.  Id.  She exhibited no difficulties with the alphabet or counting backwards from 20 to 1.  She could spell simple words such as "world" backwards.  Id.  She had above average immediate and delayed memory capacity.  Tr. 1952-53.  There was no evidence of poor effort or inconsistency in her responses to the various tasks asked of her.  Tr. 1953.  She received an overall score of 23 on the Beck Depression Inventory II exam, indicating a moderate level of self-reported depression symptomatology.  Id.

Based on his evaluation, Dr. Cole diagnosed Plaintiff with Unspecified Bipolar and Related Disorder, PTSD without Dissociative Symptoms, and Rule/Out Borderline Personality Disorder.  Id.  He opined that she could benefit from follow-up psychological services and behavioral medication management.  Id.  Testing revealed mild problems in attention and concentration.  Id.  If she were to pursue a "vocational placement in the near future," her levels of

anxiety and problems interacting with others would be the primary factors impacting her overall level of vocational success.  Id.  Dr. Cole further remarked that the results of the current evaluation were generally consistent with records available to him.  Tr. 1954.  In completing a checklist form of her mental ability to perform certain work-related activities, Dr. Cole found that Plaintiff had no or mild limitations in several abilities, and moderate limitations in the abilities to interact appropriately with the public, to interact appropriately with supervisors, and to interact appropriately with coworkers.  Tr. 1955-56.  He found her ability to respond appropriately to the usual situations and to changes in a routine work setting to be markedly limited.  Tr. 1956.

Dr. Alvord interviewed Plaintiff in April 2014 and like Dr. Cole, completed a narrative report and a mental residual functional capacity (MRFC) checklist evaluation.  Tr. 2113-2126. Dr. Alvord also conducted a clinical interview, a mental status examination, and a Beck Depression Inventory exam.  Tr. 2113.  He also reviewed an extensive list of records, including those related to Plaintiff's disability benefits applications as well as hospital and medical records from 2003 to 2012.  Tr. 2113-14.  Additionally, he reviewed Dr. Cole's February 2014 report.  Id. As with Dr. Cole, Plaintiff was able to spell the word "world" backwards and forward with Dr. Alvord.  Tr. 2119.  She had adequate abstract thought as assessed with proverbs, was able to name the current and most recent presidents, and had intact long- and short-term memory.  Id. Her thought processes were globally intact, although she presented as somewhat tangential.  Id. However, she was easily redirected.  Id.  She was able to recite six digits forward and five digits backwards, accurately compute simple arithmetic problems, and complete serial sevens for three spans without error.  Id.  She also completed "serial 3s," slowly, but accurately.  Id.

Based on his examination, Dr. Alvord concluded that Plaintiff suffered from Bipolar Affective Disorder, PTSD, Panic Disorder with Agoraphobia, and Borderline Personality Disorder. Tr. 2120-21. He explained that Plaintiff endorsed experiencing mania first in adolescence and had her first depressive episode in late adolescence/young adulthood. Tr. 2120. He reported that she had cycled fairly rapidly at times over the years, acting in a grandiose manner, needing limited sleep, and taking on tasks that she failed to complete. Id. She demonstrated symptoms of PTSD, including ongoing nightmares and flashbacks, psychological reactivity, emotional numbing, and avoidance. Id. She is paranoid and suffers from weekly panic attacks. Id. As to her Borderline Personality Disorder, Dr. Alvord noted her history of self-harm behavior, unstable relationships, and emotional lability. Id. He noted that despite her several years of psychiatric treatment, she still continued to present as quite anxious. Id. Her treatment, Dr. Alvord thought, was "managing manic episodes," even though she fell in the severe range of depression and her anxiety was acute. Id.

Dr. Alvord opined that Plaintiff had been unable to work well before her last insured date of June 30, 2007 and was unemployable. Id. He believed she was barely managing at the time, even without the responsibility of work. Id. He opined that if she were placed in a work environment, she would be likely decompensate quickly. Id. He thought she remained a significant suicide risk. Id. He believed her prognosis was poor. Id.

As to the MRFC, he found that Plaintiff would be precluded in the following abilities for 10% of a 7.5 hour work day: (1) to understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to sustain an ordinary routine without special supervision; (4) to make simple work-related decisions; (5) to get along with co-workers or peers without distracting

16 - OPINION & ORDER

them or exhibiting behavioral extremes; and (6) to be aware of normal hazards and take appropriate precautions.  Tr. 2123-24.  He also found that she would be precluded in the following abilities for 15% or more of a 7.5 hour work day:  (1) to maintain attention and concentration for extended periods; (2) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) to work in coordination with or proximity to others without being distracted by them; (4) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) to interact appropriately with the general public; (6) to accept instructions and to respond appropriately to criticism from supervisors; (7) to travel in unfamiliar places aor to use public transportation; and (8) to set realistic goals or to make plans independently of others.  Id.

The ALJ discussed Dr. Cole's and Dr. Alvord's evaluations.  Tr. 26.  In crediting Dr. Cole's conclusions over Dr. Alvord's, the ALJ explained:

> The claimant underwent two different consultative psychological evaluations within a two-month period in early 2014.  The first evaluation occurred in February 2014, when licensed psychologist Gregory Cole, Ph.D., noted that the claimant "was able to complete a simple multiple-step task, with no errors, when she was asked to sequentially place five items, one item after another after given instructions.  Dr. Cole observed no problems with attention and concentration during standardized testing, and her immediate functioning was characterized as "above average."  Upon examination, Dr. Cole concluded that the claimant could reasonably sustain "simple routine tasks" that accounted for her "problems interacting with others."  The psychologist noted that the claimant would likely have "marked" difficulty responding appropriately to changes in a routine work setting.
>
> In April 2014, the claimant attended a psychological evaluation arranged by her attorney.  Licensed psychologist Scott Alvord, Psy.D., observed that the claimant's immediate and working memory was intact and her concentration was sufficient to perform simple tasks like spelling "WORLD" forward and backward correctly.

Dr. Alvord nevertheless concluded that the claimant was "barely managing at this time" and that she would likely decompensate "quickly" if placed within a work environment. The psychologist was particularly concerned with the claimant's history of suicidal ideation - and noted that the claimant remained a "significant" suicide risk. I note that the claimant denied any feelings of suicidal ideation only two months earlier during her interview with Dr. Cole. When considered with the claimant's other inconsistent statements regarding her activities of daily living and her past drug use, I am less inclined to adopt Dr. Alvord's assessment - which appears to rely primarily on the claimant's subjective reporting. Dr. Alvord acknowledged that the historical information offered by the claimant was "potentially lacking in accuracy." The claimant's performance on standardized intellectual testing was generally consistent between both evaluations, and reasonably suggests that the claimant can sustain simple tasks with limited social interaction. Accordingly, I give greater weight to the opinions offered by the State agency consultants and Dr. Cole.

Tr. 26 (citations omitted).

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence. If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted).

Plaintiff argues that the ALJ's rejection of Dr. Alvord's opinion is not based on substantial evidence. Plaintiff contends that the ALJ's assertion that Dr. Alvord's opinion was primarily based on Plaintiff's subjective reporting is not supported by the record. She also argues that the ALJ failed to appreciate the transient nature of bipolar disorder which, in Plaintiff's opinion, explained why she did not demonstrate suicidal ideation with Dr. Cole but did with Dr. Alvord. As to the first argument, the ALJ did not err. Both Dr. Cole and Dr. Alvord performed clinical interviews, administered similar mental health status examinations, observed her behaviors, and administered the Beck Depression Inventory test. Dr. Cole actually administered one additional

18 - OPINION & ORDER

objective test that Dr. Alvord did not: the Wechsler Memory Scale - Immediate and Delayed Memory test. <u>Compare</u> Tr. 1949 with Tr. 2113.[3]   In contrast to Plaintiff's assertion, the record shows that Dr. Cole, not Dr. Alvord, utilized more objective evaluation tools.

Dr. Alvord reviewed extensive records but Plaintiff's assertion that Dr. Cole reviewed only her Serenity Lane records in inaccurate.  Dr. Cole stated that "[r]ecords were also reviewed, including reports by: Serenity Lane." Tr. 1949.  The use of the plural "records" plus the use of "including" shows that Dr. Cole's review was not limited to the Serenity Lane reports but included additional records as well.  Plaintiff also argues that Dr. Alvord's review of more than 1,800 pages of medical records "counteract[s]" Dr. Alvord's statement that Plaintiff's reported history was "potentially lacking in accuracy." Pl.'s Brief 27.  Not all of the 1,800 pages Plaintiff refers to were medical records.  A portion of these records are reports completed by Plaintiff in support of her disability benefits applications and SSA determinations regarding those applications.  Tr. 2113-14 (Dr. Alvord's list of records reviewed); Tr. 107-38, 169-89, 195-218, 220-47, 273-84, 300-52 (the SSA records reviewed by Dr. Alvord).

Additionally, many of the medical records concern physical impairments outside of Dr. Alvord's area of expertise.  <u>E.g.</u>, Tr. 424-89 (January 2004 records from emergency department and inpatient treatment at Mercy Medical Center for a particular type of pneumonia; of sixty-eight pages of records, only a few devoted to discussion of her psychiatric/psychological  history and symptoms); Tr. 592-640 (August 2010 records from McKenzie-Willamette Medical Center for treatment of pyelonephritis and bladder spasms; of forty-nine pages of records, none relate

_____

[3]  Additionally, while Dr. Alvord's report states that he administered the Beck Depression Inventory exam, his report fails to note Plaintiff's score on the exam.  In contrast, Dr. Cole notes that she scored 23 which indicated a moderate level of depression symptomatology.  Tr. 1953.

exclusively to psychiatric/psychological history or symptoms); Tr. 2014-2111 (office records
from Umpqua Community Health Center dated December 5, 2011 to November 5, 2013; of
ninety-seven pages of records, only sporadic references to psychiatric/psychological history).
And, even if the medical records gave context to Plaintiff's reported history, Dr. Alvord
nonetheless still cautioned that her reported history was "potentially lacking in accuracy." Tr.
2121.

Furthermore, while Plaintiff contends that Dr. Alvord conducted a more thorough
evaluation of Plaintiff than Dr. Cole because he spent more time interviewing her, that does not
undermine the ALJ's conclusion that Dr. Alvord's conclusions were primarily based on Plaintiff's
subjective reporting.  Dr. Alvord's report shows that he extensively noted what Plaintiff reported
to him regarding her history, background, and current symptoms.  Tr. 2113-16.  Additional notes
reflect that his opinion considered her subjective statements regarding her mood and thought
content.  E.g., Tr. 2118 ("Mood was described as depressed."  "She endorsed ongoing transient
suicidal ideation."); Tr. 2119 ("She described a history of grandiosity during manic episodes").

A treating or examining physician's opinion may be rejected if based on an uncredible
claimant's subjective reports.  See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (ALJ
did not err in rejecting opinions based on subjective complaints).  Because the ALJ's credibility
determination was not in error and because the ALJ properly determined that Dr. Alvord's report
relied heavily on Plaintiff's subjective reports, this basis for discounting Dr. Alvord's report was
not erroneous.

As to the cyclical nature of the disease, Plaintiff relies on a statement from Dr. Alvord
provided after the ALJ's decision, suggesting that "[i]t is likely that when [Plaintiff] met with Dr.

20 - OPINION & ORDER

Cole two months prior, she was transitioning between a depressive and manic episode which often results in an increase in function briefly before the person enters the next maladaptive mood episode." Tr. 2138. He further indicates, while conceding that this is "conjecture," that Plaintiff did not acknowledge suicidal ideation to Dr. Cole due to "limited rapport." Id.

The record shows that Plaintiff was a patient at Douglas County Mental Health from October 24, 2012 to March 18, 2014. Tr. 1959-2013. In the several months before February 2014 when Plaintiff saw Dr. Cole, she was seeking treatment to address her mood and sleep issues. E.g., Tr. 1972 (Oct. 15, 2013 chart note of "Annual Mental Health Assessment" in which Plaintiff reported that since starting services "last year," she still had manic episodes but was coming out of them faster; further noting she had sporadic suicidal ideations but no plan or intent); Tr. 1970-71 (Oct. 15, 2013 chart note indicating new medication "Loxapine" had started calming her mood, making her "more level'; further noting her report that the sleep aid of Zaleplon had become ineffective); Tr. 1968-69 (Nov. 20, 2013 chart note indicating that Plaintiff had stopped taking Loxapine entirely when an increased dose made her "fuzzy" but plan was to restart on a lower dose); Tr. 1966-67 (Dec. 16, 2013 chart note showing that Plaintiff reported feeling stable, "medicines are working"; still expressing concern about chronic insomnia); Tr. 1965-66 (Jan. 23, 2014 chart note stating that Plaintiff "denies any suicidal or homicidal ideations in several months"; reporting feeling "really well" since beginning to take Topomax); Tr. 1963-65 (Jan. 23, 2014 chart note stating that Plaintiff reported being pleased with her improvement in mood and had no homicidal or suicidal ideation; she noted she was sleeping "relatively good" and described her sleep as "adequate").

As can be seen from these records, Plaintiff reported doing well and denied any suicidal

21 - OPINION & ORDER

ideation just two weeks before seeing Dr. Cole. Her mental health providers indicated that she

had been stable since mid-December 2013 and had had no suicidal ideation in months. These

records refute Dr. Alvord's suggestion that Plaintiff did not report suicidal ideation to Dr. Cole

because she was not comfortable with him. The fact that she denied any suicidal ideation to her

treating mental health providers just two weeks before her evaluation by Dr. Cole is consistent

with her report and presentation to Dr. Cole.

Plaintiff had three appointments at Douglas County Mental Health between Dr. Cole's

evaluation and Dr. Alvord's evaluation. Tr. 1960-63. All of them show continued stability. Tr.

1963 (Feb. 11, 2014 chart note stating that Plaintiff denied risk of harm to self or others, that

Plaintiff reported "settling into a good routine," that she had quit smoking, that she was actively

engaging with family and friends in her home although she continued to stay home most days;

Plaintiff further reported that although she continued to experience significant grief and

nightmares over her sons' deaths, she was finally ready to accept the grief material offered by the

therapist); Tr. 1961-62 (Feb. 24, 2014 chart note stating that Plaintiff was thrilled by having quit

smoking for two months, Plaintiff was sleeping; Plaintiff was assessed as having adequate

judgment, insight, and concentration, intact fund of knowledge, memory, and associations, no

psychosis or paranoia, and was fully oriented, smiling, and interactive); Tr. 1960 (Mar. 18, 2014

chart note showing that Plaintiff denied risk of harm to self or others, she had no change in her

mental status, she was knitting to assist her with calming skills when she felt overwhelmed, she

continued to have improved sleep, and she was interacting more with family and friends).

While the Douglas County Mental Health Records show no visits for the approximately

five weeks before Dr. Alvord's evaluation in late April 2014, the records through March 18, 2014

do not support Dr. Alvord's hypothesis that when Plaintiff met with Dr. Cole, she was "transitioning between a depressive and manic episode[.]" Tr. 2138. To the contrary, the contemporaneously-generated records show increasing stability with no acute depressive episode for at least a few months before Dr. Cole's evaluation and continuing after that as well.

As a result, Dr. Alvord's after-the-fact explanation for why Dr. Cole's report was flawed is not supported by substantial evidence in the record. Therefore, the ALJ's rejection of Dr. Alvord's opinion was proper. Given the disparity between the two psychologists' opinions which were based on interviews occurring relatively close in time to each other, the ALJ appropriately considered the reasons for Plaintiff's divergent self-reports to the examiners. Although Plaintiff's bipolar disease may present with cycles of mania and depression, the substantial evidence in the record shows that the two evaluations occurred during a period of stability. The record supports the finding that Plaintiff's lack of credibility regarding her subjective symptoms rendered Dr. Alvord's opinion less reliable. The ALJ did not err in crediting Dr. Cole's opinions over Dr. Alvord's.

III. Lay Opinion Testimony

On January 10, 2012, Plaintiff's husband Daniel Carr completed a Third Party Function Report. Tr. 324-31. The ALJ gave only partial weight to this testimony. Tr. 26. The ALJ noted that Carr reported that Plaintiff had memory difficulties and therefore had difficulty completing either written or spoken instructions. Id. (citing Tr. 329). The ALJ concluded that this was contrary to the objective medical testing which noted that Plaintiff retained above average memory functioning. Id. The ALJ also noted Carr's report that Plaintiff had an "'adversarial' attitude toward authority figures." Id. (citing and quoting Tr. 329). The ALJ agreed that this

23 - OPINION & ORDER

observation was "consistent with [Plaintiff's] past employment, which reportedly involved a

conflict with [an] argumentative supervisor." Id.  But, the ALJ explained, in "one-on-one

situations, like psychological evaluations, the claimant presented as alert and cooperative and

demonstrated an ability to perform simple tasks." Id.  Thus, the ALJ gave "partial weight to Mr.

Carr's observations, to the extent they reasonably support a restriction to simple, unskilled tasks

involving few, if any, workplace changes and limited social contact." Id.

An ALJ must take lay witness testimony regarding a claimant's symptoms into account.

Molina, 674 F.3d at 1114.  However, to discount lay witness testimony, the ALJ must give only

reasons "germane to the witness."  Valentine v. Comm'r, 574 F.3d 685, 694 (9th Cir. 2009).

Plaintiff argues that the ALJ erred in giving only partial weight to Carr's statements

because the record shows that Plaintiff was frequently uncooperative and defiant with medical

providers, not just a former employer.  She cites to fifteen separate records in support of this

assertion.  Several of them do not show behavior which can fairly be described as uncooperative

or defiant.  E.g., Tr. 432 (Jan. 12, 2004 hospital record noting that Plaintiff became "quite

agitated" and threatened to leave upon arriving in the ICU where she was being admitted because

she was seriously ill, but noting that she was "quite hypoxic with oxygen saturations of 71%" and

unable to make that decision; further noting that her delirium and agitation calmed down after

receiving medication); Tr. 837 (May 25, 2004 emergency department report noting Plaintiff was

"slightly confused" after resolution of a seizure; no comments about uncooperative or defiant

behavior); Tr. 505 (March 17, 2005 report noting that after experiencing abdominal and rectal

pain, Plaintiff insisted on having a colonoscopy which the physician believed was unnecessary;

no comments about uncooperative or defiant behavior); Tr. 1015 (Aug. 19, 2011 emergency

24 - OPINION & ORDER

department note stating that Plaintiff disagreed with the diagnosis of sunburn but no notations

regarding uncooperative or defiant behavior); Tr. 1030 (May 20, 2011 emergency department

note stating that because Plaintiff was under a great deal of stress, the nurse called for a mental

health evaluation; no notations regarding uncooperative or defiant behavior).

Other records cited by Plaintiff indicate that she has been demanding when told she could

not smoke.  E.g., Tr. 852 (May 23, 2004 emergency department note stating that there was a

conflict between Plaintiff and the staff over her going out to smoke); Tr. 825 (May 26, 2004

hospital record indicating Plaintiff left against medical advice to go outside to smoke); Tr. 534

(Nov. 5, 2006 report from Good Samaritan Hospital noting a previous incident at Sacred Heart

where Plaintiff was a psychiatric patient and acted out badly when learning she was not allowed

to smoke at the facility); Tr. 1088-90 (Nov. 5, 2006 report from Cottage Grove Community

Hospital also noting previous incident at Sacred Heart).  One other record reveals no

uncooperative or defiant behavior but notes that Plaintiff left an emergency room after initial

treatment but against medical advice when her request for non-narcotic pain medication was

refused.  Tr. 1069.

A small number of the records Plaintiff cites supports Plaintiff's position that she

sometimes acted out or was uncooperative while in a hospital setting, although one of the records

makes clear that her anger was as a result of an argument she had with her husband and was

unrelated to hospital staff.  See Tr. 511 (July 16, 2005 record from Serenity Lane stating that

Plaintiff was defiant and angry during her detox and evaluation period, resulting in a staff

decision to discharge her); Tr. 936-37 (Nov. 24, 2010 emergency department record noting

Plaintiff's demand to see a different physician when the one treating her refused her request for

25 - OPINION & ORDER

IM Dilaudid; noting that Plaintiff stormed out angry and upset); Tr. 1017 (July 25, 2011

emergency department note stating that Plaintiff presented to the emergency room "quite

demanding and hysterical," asking to have her suprapubic catheter removed because of pain and

fever; further noting that staff eventually got her calmed down); Tr. 1216-19 (Jan. 22, 2010

emergency department records where Plaintiff was seen after a motor vehicle accident and was

likely intoxicated, noting she was agitated, confrontational, and refused to answer questions); Tr.

532 (Nov. 8, 2006 hospital note noting that while Plaintiff was an inpatient for psychiatric care

two weeks after her son's suicide, she had an argument with her husband on the telephone

causing her to throw the phone on the ground, smash another phone on the wall, and kick "stuff

around the unit while sobbing").

Of the several dozens or more medical encounters Plaintiff has had over the years, she

cites to no more than a handful of instances in which, outside of the context of being denied the

ability to smoke, her behavior can be characterized as demanding, uncooperative, or defiant.  At

the same time, she has had several encounters in which she was cooperative, including during her

consultative examinations with Dr. Cole and Dr. Alvord, her almost eighteen-month treatment at

Douglas County Mental Health, her thirteen months as a patient with Pain Consultants of

Oregon, tr. 961-1011, and her treatment over several years as patient with various practitioners

for various issues.  Tr. 1111-1915 (containing records from Carl Schreiner, M.D., Douglas

Medical Group, Harmony Health for Women, Keith Harris, M.D., Sutherlin Family Practice).

Given the overall record, the ALJ did not err in partially rejecting Carr's testimony.

While Plaintiff has occasionally shown an "adversarial attitude" towards medical practitioners in

certain situations, the ALJ correctly observed that in one-on-one situations like psychological

evaluations, she presented as alert and cooperative.  The ALJ's restrictions of simple, unskilled tasks involving few workplace changes and limited social contact appropriately account for the portion of Carr's testimony that was supported by the record.

Given that the ALJ's findings regarding Plaintiff's credibility, Dr. Alvord's opinions, or Carr's testimony were not erroneous, the ALJ did not err at steps four or five.

CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this _____9_____ day of _____November_____, 2016

Marco A. Hernandez
United States District Judge

27 - OPINION & ORDER